VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      25-AP-189

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JANUARY TERM,   2026

Russell Japikse\* v. Jenny Parker

} APPEALED FROM:
} Superior Court, Chittenden Unit,
} Family Division
} CASE NO. 22-DM-01156
Trial Judge: Kate T. Gallagher

In the above-entitled cause, the Clerk will enter:

Father appeals a family division order upholding a magistrate's determination of his child-support obligation.  We affirm.

## I.  Background

The parties were never married and share one child, a daughter born in May 2021.  In May 2022, the parties separated, and father filed this parentage action.  In December 2022, pursuant to the parties' stipulation, the court issued a final order on parental rights and responsibilities and parent-child contact.

The magistrate held a hearing on the establishment of child support and mother's request for a maintenance supplement over four days between April 2023 and January 2024.  Based on the evidence presented, the magistrate made the following findings of fact.

The parties began dating in 2015.  At the time, mother was a critical-care nurse in Washington, and father was an emergency physician in Oregon.  They moved in together in 2017, and subsequently relocated to Arizona, then Wisconsin, then Idaho.

In the fall of 2020, mother became pregnant with daughter and stopped working due to a pregnancy-related illness.  The parties moved to Vermont to be closer to their families and purchased a three-bedroom home in Williston.  The home purchase was partially funded by money from father's family, and there was no mortgage.

After daughter was born, mother stayed home with her.  At the time, father was working approximately ten to eleven days per month at a Wisconsin hospital and traveling back and forth

to Vermont. He was earning approximately $22,000 monthly. The parties' lifestyle was comfortable but not extravagant.

Father moved out of the Williston house when the parties separated in May 2022. Without providing advance notice to mother, he withdrew the majority of the money in the parties' joint bank account and discontinued their shared credit cards. Father left mother with $5000 to address near-term financial needs. He also began voluntarily paying mother $1359 in monthly child support, an amount that he determined. He continued making these payments throughout the pendency of the case.

Within six weeks of the parties' separation, mother reentered the workforce as a nurse, earning $83,000 per year. Father continued to work in Wisconsin but also began working at two Vermont hospitals. During 2022, father's W-2 earnings from all three positions totaled $301,921.81.

In this period, father contributed toward various bills associated with the Williston home. He also provided health-insurance coverage for daughter until coverage became available through mother's new job. He fully reimbursed mother for the cost of childcare, which both parties utilized.

In September 2022, mother moved out of the Williston house, and father moved back in. Mother moved into a two-bedroom townhouse in Essex, which she purchased subject to a mortgage. At some point, the parties reached a settlement regarding mother's share of the equity in the Williston home. Father paid mother $23,000, which she then used in part to pay back a loan from her parents.

Until mid-November 2022, daughter spent all overnights with mother as mother was still breastfeeding and father was working in Wisconsin periodically. Father then began having daughter for one or two overnights each week. Under the December 2022 stipulated order, the parties share legal and physical parental rights and responsibilities. Father will have daughter for 43% of overnights until she is about to start kindergarten, at which time he will have 50% of overnights.

By the end of 2022, father left his position in Wisconsin. During 2023, father also left his position at one of the two Vermont hospitals because it interfered with his parent-child contact. He continued working at the other Vermont hospital, where he earned $28,620 per month. He also began working as an independent contractor at a New Hampshire hospital, from which he earned at least $7557.55 monthly. Between these two roles, father was working approximately 144 hours per month, slightly more than the industry standard.

In addition to his employment income, father received income from his ownership interest in his family's corporation, CN Holdings. Including this amount, the court determined that father's taxable income from all sources was: $532,710 in 2021; $553,882 in 2022 (or $1,497,940 including Schedule E income); and $619,036.60 in 2023. Father's total claimed expenses were $35,590.13 per month, including his voluntary support payments and childcare reimbursement. The court found that under a conservative estimate of father's income, he had a monthly budget surplus of $16,752.97.

In March 2023, mother reduced her hours to 60% in order to pursue a graduate degree. This reduced her income to $4,354.25 per month but allowed her to retain health-insurance benefits for herself and daughter. The magistrate found that mother was not voluntarily underemployed despite cutting back her hours to pursue her education, explaining that daughter was still young and would benefit from mother's anticipated increased earning capacity in the future. Upon completing the twenty-seven-month program, mother expected to be able to earn between $110,000 and $150,000 annually as a psychiatric mental health nurse practitioner. She had to take out student loans to pay for this schooling. By the last hearing day, she had borrowed $31,162. She anticipated having to borrow an additional $60,000 in order to complete the program in late 2026.

Mother's monthly expenses exceeded her income by $9343.54 per month. She ceased contributing to her 401(k) upon entering graduate school. Because mother could not afford additional childcare, she had to take unpaid leave from work if daughter became sick during her time with mother. Unlike father, mother had both a monthly mortgage and a car payment. Even if mother earned $150,000 per year after graduating, her expenses would still exceed her income.

The magistrate explained that because the parties' combined available income exceeded the uppermost levels of the child-support guideline, the statute directed the court to exercise its discretion in determining an appropriate level of support. The magistrate then considered the parties' respective proposals as illustrative of what each felt was fair. Mother proposed that the magistrate adopt a linear extrapolation from the guidelines. She argued that this would result in a support obligation in excess of $13,000 per month from the date of filing in May 2022 through the end of that year, and then in excess of $5000 monthly thereafter. Father suggested various nonlinear extrapolation methodologies, resulting in a support obligation between $2200 to slightly more than $3000 monthly.

The magistrate then analyzed the factors set forth at 15 V.S.A. § 659(a). He concluded that mother, the custodial parent, had financial resources comparable to those of most Vermonters, while father's financial resources were "considerably greater" and "far in excess of what most Vermonters experience." Id. § 659(a)(2), (6). During the brief time the parties lived together with daughter, their lifestyle was comfortable but not extravagant. Id. § 659(a)(3). They vacationed with daughter at father's parents' time-share in the Caymen Islands. Following the parties' separation, father was able to continue vacationing with daughter. Mother was less able to do so. The magistrate found that daughter would have enjoyed a greater standard of living had parents stayed together.

With respect to daughter's financial resources, id. § 659(a)(1), the magistrate noted that father was working toward a goal of saving sufficient funds to cover her college expenses. Father had a medical degree as well as an engineering PhD; he did not need further education and had no student-loan debt. Mother was attending graduate school to improve her earning potential and thus incurring student-loan debt. Id. § 659(a)(8). There were no ongoing extraordinary travel expenses incurred in exercising parent-child contact after father left his job in Wisconsin. Id. § 659(a)(9). The magistrate did not find significant the impact of inflation and noted that there was no evidence that daughter had any unusual needs and there were no ongoing extraordinary expenses for her educational needs. Id. § 659(a)(4), (5), (7).

3

As to § 659(a)(10), which allows for consideration of "[a]ny other factors the court finds relevant," the magistrate noted the following. Father's sudden, unilateral decision to end the parties' relationship in May 2022, coupled with his actions with respect to the parties' finances, left mother "in a financial bind, scrambling to find childcare and employment." Though father voluntarily provided child support and covered most of mother's childcare expenses, "he was not overly generous." Finally, the magistrate noted that while mother's income would likely increase after she completed her graduate degree, this would do little to diminish the gap between the parties' financial resources, and she would still have her student loans to repay.

After weighing these considerations, the magistrate concluded that mother's request for ongoing child-support in excess of $5000 monthly was fair to both the parties and daughter. He established child support at $7000 per month, explaining that this amount was not based on the shortfall in mother's budget—although this was a consideration—but that this amount would allow daughter to enjoy some of the fruits of father's continuing success while with mother, and it was an amount father can afford to pay. He also granted mother's request to establish this obligation retroactive to the date of filing, though he gave father a credit of $2000 per month based on his voluntary support payments and a portion of his reimbursements of childcare expenses. This resulted in a judgment of $127,500, which father was to repay at a rate of $1000 per month.

The magistrate denied mother's request for a maintenance supplement pursuant to 15 V.S.A. § 661, however, explaining that he had already taken the parties' respective financial circumstances into account in the deviation analysis and awarded support in an amount that would address the disparity in the child's standard of living following the parties' separation.

Father appealed to the family division, which affirmed the magistrate's final child-support order. He now appeals to this Court.

II. Analysis

The "central component" of Vermont's child-support system "is a set of tables which reflect the percent of combined available income which parents living in the same household in Vermont ordinarily spend on their children." Smith v. Stewart, 165 Vt. 364, 368 (1996) (quotation omitted). The statute "creates a rebuttable presumption that the amount reflected in the child-support guidelines is the amount of support needed by the children." Tetreault v. Coon, 167 Vt. 396, 405 (1998). However, where the parties' "combined available income exceeds the uppermost levels of the support guideline," the court may "use its discretion in determining child support." 15 V.S.A. § 656(d).

We have held that "in exercising its discretion under § 656(d), the court must consider the factors specified in § 659(a)." Harris v. Harris, 168 Vt. 13, 19 (1998); see 15 V.S.A. § 659(a) (listing factors court must consider before deviating from support obligation set forth in guidelines). "As long as the court considers the statutory factors, makes adequate findings and explains its reasoning in determining the support obligation, its discretion is not limited to adopt or avoid a particular methodology." Smith, 165 Vt. at 372; see also Harris, 168 Vt. at 19-21 (explaining that while court may adopt methodology of extrapolation from guidelines, it is not required to do so). "The only other requirement under § 656(d) is that the court's decision must be consistent with the principles behind the guidelines." Harris, 168 Vt. at 19.

On appeal, father argues that the final child-support order must be reversed because the magistrate erred in calculating his income and, as a result, erred in determining that the parties' combined available income exceeded the uppermost levels of the support guideline such that § 656(d) applied. In the alternative, father contends that even if the magistrate correctly calculated his income and applied § 656(d), the magistrate abused his discretion by calculating the appropriate amount of support based not on the principles undergirding the child-support guidelines, but instead on the purposes underpinning property-division and spousal-maintenance awards upon divorce.

This Court's review is based on the record before the magistrate. Patnode v. Urette, 2015 VT 70, ¶ 6, 199 Vt. 306. "We will affirm the magistrate's factual findings unless clearly erroneous and will uphold the magistrate's conclusions if reasonably supported by the findings." Stone v. Henneke, 2024 VT 26, ¶ 12, 219 Vt. 291 (quotation omitted). We review questions of law without deference. Merchant v. Merchant, 2015 VT 72, ¶ 7, 199 Vt. 406.

We first consider father's argument that the magistrate erred in calculating his income for purposes of determining whether § 656(d) applied. Father contends that the magistrate erred in excluding taxes from his income and concluding, based on speculation, that he would continue to receive annual income from CN Holdings. He asserts that had the magistrate correctly calculated his income, the parties' combined available income would not exceed the uppermost levels of the guideline. On this basis, father asks that we reverse and remand the final child-support order for calculation of the guideline amount.

Father failed to preserve these arguments for our review on appeal because he agreed, throughout the proceedings before the magistrate, that this was an above-the-guideline case. See Merchant, 2015 VT 72, ¶ 11 (declining to address arguments not presented to magistrate). At the outset of the first hearing day in April 2023, father's attorney indicated that his 2022 income "exceeded the guideline figure" and that the same might be true of his 2023 income. She therefore stated, "we need to establish a child-support figure, but obviously even the guideline figure will be based on something that exceeds the guideline." During the next day of the hearing in July 2023, the magistrate noted in ruling on the admissibility of one of father's exhibits that "this is going to be an above-the-guideline calculation" and the proffered exhibit was relevant to that analysis. No party objected to the magistrate's characterization. Before the hearing concluded, the magistrate directed the parties' attention to our cases governing above-the-guidelines calculations, explaining that this was "just so you know what I'm going to be looking at." Again, no party disputed that this was the appropriate legal framework. Indeed, in father's subsequent motion to reconsider, he acknowledged that the magistrate had "broad discretion" to issue an order "in an 'above the guideline' case." An issue is preserved for appeal only where it is presented below in a manner which gives the original tribunal "a fair opportunity to rule on it." State v. Ben-Mont Corp., 163 Vt. 53, 61 (1994). Father repeatedly conceded before the magistrate that § 656(d) applied. He cannot now argue that this is not an above-the-guideline case.

With this understanding, we turn to father's alternative argument: that even assuming his income was correctly calculated and § 656(d) applied, the magistrate abused his discretion in determining the appropriate amount of support. The crux of his challenge is that, in focusing on the discrepancy between the parties' financial resources rather than the standard of living

5

daughter enjoys at their respective homes, the magistrate strayed from the principles underlying the child-support guidelines and instead adopted a rationale grounded in the justifications undergirding the statutory provisions for property division and spousal-maintenance awards upon divorce, 15 V.S.A. §§ 751, 752.

We first note that the cases father relies on do not support his argument. He points to our decisions in Roddy v. Roddy and Leas v. Leas, but both of these cases involved a party's request for a maintenance supplement under 15 V.S.A. § 661(a).[*] See Roddy v. Roddy, 168 Vt. 343, 348-49 (1998) (holding that party seeking maintenance supplement after final divorce and child-support order must make threshold showing of real, substantial, and unanticipated change of circumstances); Leas v. Leas, 169 Vt. 364, 368 (1999) (concluding that statute does not authorize award of maintenance supplement where parties equally share physical custody of children). As noted above, the magistrate denied mother's request for a maintenance supplement here. Roddy and Leas are simply inapposite. Similarly, father argues that because Harris v. Harris was decided by a two-Justice plurality, language from the concurrence requires the magistrate to find that the disparity in the parties' financial circumstances has resulted or will result in a lower standard of living than the child would have had if living with the noncustodial parent before analyzing the § 659(a) factors. The language father quotes from the concurrence, however, simply recites the text of § 661(a) and opines that while the magistrate's award was a reasonable exercise of discretion under § 656(d), "[t]he same result could have been accomplished . . . by resort to the maintenance supplement provision." Harris, 168 Vt. at 27 (Morse, J., concurring). Father has not identified any authority to support the conclusion that there are constraints on the court's exercise of discretion under § 656(d) beyond those described above.

Nor has father demonstrated that the magistrate abused his discretion under the applicable standard. The magistrate carefully considered each of the § 659(a) factors. See Harris, 168 Vt. at 19. He made detailed findings and fully set forth the reasoning underlying his determination of father's support obligation. See Smith, 165 Vt. at 372. Father simply speculates, based on various observations about the amount of the award and the tenor of the magistrate's findings, that the decision was driven by considerations appropriately weighed in connection with the division of marital property or an award of spousal maintenance. But father has not made the requisite demonstration that the award was inconsistent with "the principles behind the guidelines." Id.

We have recognized that the guidelines are intended "to improve the efficiency of child support adjudication" and "eliminate discrepancies in awards for children in similar circumstances." Harris, 168 Vt. at 20. As the magistrate observed, this case involved the "unusual situation" in which the guidelines do not apply. The guideline maximum "represents the highest income for which tables are useful or appropriate." Smith, 165 Vt. at 368. Therefore, where the parties' combined available income exceeds this amount, the statute gives

---

[*] Under 15 V.S.A. § 661(a), a party "may request a child support maintenance supplement to be paid while a child support obligation arising out of an action for support exists," and the court must order payment of such supplement to the obligee "to correct any disparity in the financial circumstances of the parties if the court finds that the disparity has resulted or will result in a lower standard of living for the child than the child would have if living with the noncustodial parent."

6

the court discretion to determine an appropriate award.  Such awards may be less efficient or predictable than guideline awards, but this does not render them at odds with the principles underlying the guidelines.  Cf. Harris, 168 Vt. at 21 ("Obviously, reducing discrepancies between child support orders is more readily achievable when the guidelines apply than when they do not.").

In any event, the "main purpose of the guidelines is to ensure that children enjoy the same standard of living they would enjoy if their parents were living together."  Id. at 19-20.  Thus, in above-the-guidelines cases, "the amount of child support should be based on the policy of meeting the needs of the children and having them share in family income."  C.D. v. N.M., 160 Vt. 495, 500 (1993).  However, "the term 'need' must be used broadly to reflect the general standard of living of the family," and the fact that children's "basic needs . . . are met does not mean that they do not have needs that should be addressed by a further increase in child support."  Smith, 165 Vt. at 369.  Because children are entitled to share in family income, their "needs increase proportionally with their opportunity to participate in educational, cultural, and recreational activities."  Id. (quotation omitted).  The magistrate's award aligned with this purpose.  He found that the parties' daughter would have enjoyed a greater standard of living had the family remained intact and established support in an amount that addressed this disparity and would allow daughter to enjoy some of the fruits of father's continuing success while with mother.

That the magistrate considered the gap between the parties' resources and the existence of mother's student-loan debt to determine the standard of living each party could provide for daughter does not, as father suggests, render the magistrate's decision a maintenance award masquerading as child support.  "[M]aintenance is intended specifically to provide for the [obligee] spouse's own needs," while child support "is governed by a different statutory regime and intended to serve a different purpose."  Gulian v. Gulian, 173 Vt. 157, 160-61 (2001) (explaining that in linking maintenance award to age of children while not awarding child support, court effectively required that some portion of maintenance be used for child support).  While an award of child support "necessarily has an incidental benefit" for the recipient parent, "the real beneficiaries are the children."  Smith, 165 Vt. at 370.  Nothing in the magistrate's decision can be read to suggest that daughter is not the "real beneficiary" of the award.  See, e.g., id. (rejecting argument that additional support was effectively maintenance award because "[t]here is nothing in the family court decision to suggest that the increased support was intended to be used by plaintiff and not for the support of the children").

Finally, father argues that the considerations the magistrate weighed under 15 V.S.A. § 659(a)(10) were essentially assignments of fault, making the decision more akin to a property-division award where the court may consider the "respective merits of the parties."  Id. § 751(12).  Again, we see no error.  The magistrate was required to consider the § 659(a) factors, and (a)(10) calls for the consideration of "[a]ny other factors the court finds relevant."  The circumstances of the parties' separation—in particular, its impact on mother's ability to provide for daughter—were relevant to the magistrate's decision to award retroactive arrears to the date of filing.

Father failed to preserve his argument that 15 V.S.A. § 656(d) did not apply.  The magistrate appropriately exercised his "broad discretion" under § 656(d) to determine the

7

appropriate amount of support based on the statutory deviation factors and the purposes underlying the guidelines.  <u>C.D. v. N.M.</u>, 160 Vt. at 501.  Father has not identified any basis to disturb the magistrate's final child-support order.

<u>Affirmed</u>.

BY THE COURT:

Paul L. Reiber, Chief Justice

Nancy J. Waples, Associate Justice

William D. Cohen, Associate Justice (Ret.), Specially Assigned